# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos.  01-3685/02-1361

_____

Robert A. Shafer,                    *
                                     *
    Appellee/Cross-Appellant,    *
                                     *   Appeals from the United States
    v.                           *   District Court for the
                                     *   Eastern District of Missouri.
Michael Bowersox, Superintendent,    *
Potosi Correctional Center,          *
                                     *
    Appellant/Cross-Appellee.    *

_____

Submitted:  September 9, 2002
Filed:  May 27, 2003

_____

Before HANSEN,[1] Chief Judge, LAY and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

After Robert Shafer waived his right to counsel and his right to a trial by jury for both guilt and punishment phases, he pled guilty to two counts of first degree murder and two counts of armed criminal action and requested imposition of the

_____

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003.  He has been succeeded by the Honorable James B. Loken.

death penalty.  At that same hearing, the Missouri trial judge accepted Shafer's waivers and pleas and imposed a death sentence.

Shafer sought post conviction relief in state court, and resentencing was ordered based on his sentencing phase waivers and the lack of a presentence report. Both sides appealed, and these appeals were consolidated with Shafer's direct appeal. The Missouri Supreme Court affirmed Shafer's convictions and reinstated his death sentence.  See State v. Shafer, 969 S.W.2d 719 (Mo. 1998).

Shafer then filed this petition for habeas relief under 28 U.S.C. § 2254.  After examining all the circumstances related to Shafer's waivers of counsel, guilty pleas, and waiver of the right to introduce mitigating evidence, the district court[2] concluded that the Missouri Supreme Court had unreasonably applied clearly established federal law in ruling that his waivers and pleas had been knowing, voluntary and intelligent. See Shafer v. Bowersox, 168 F. Supp. 2d 1055 (E.D. Mo. 2001).  It also concluded that the supreme court had unreasonably determined the facts in light of the evidence when it found that the trial court had considered mitigating evidence before imposing the death sentence.

Shafer was granted a conditional writ, to become permanent if the state were not to allow him to withdraw his guilty pleas and afford him an opportunity to proceed to trial.  The district court rejected Shafer's other claims, concluding that the Missouri Supreme Court had not unreasonably applied, or acted contrary to, clearly established federal law when it refused to suppress his confession and rejected his claims that ex parte contacts between the trial judge and the prosecutor had denied him due process and that he had received ineffective assistance of counsel.  Both sides appeal.

---

[2]The Honorable Lawrence L. Piersol, Chief Judge, United States District Court for the District of South Dakota, sitting by designation.

2

Keith Dennis Young and Ford Jerry Parker were shot to death on April 29, 1990, and Shafer and his friend David Steinmeyer later confessed to the murders, although they gave multiple and conflicting accounts. At different times each implicated himself or the other as the sole shooter, but each also claimed to have shot one of the victims. On July 24, 1992, Shafer gave a confession that was later used as the factual basis for his guilty pleas.

In his confession Shafer told the police that he had lost his job on the morning of April 29, 1990 and asked Steinmeyer to "come over and get high." The two spent the afternoon drinking and smoking marijuana, and began to discuss a plan to assault and rob "some homosexuals." According to Shafer he took a .22 revolver and five shells from his sister's bedroom that evening, and the friends walked to an area called Blanchette's Landing where they planned to find victims.

After they saw Young and Parker embracing, they approached the pair and asked for a ride to a neighboring town. The four set out in Young's car, which was soon taken over by Shafer and Steinmeyer and driven to a remote location. Shafer confessed that when Young and Parker tried to run away, he shot them. Shafer and Steinmeyer took money and other belongings from the bodies of the victims, and later removed items from the car. The next day both Shafer and Steinmeyer admitted to several people, including a priest and their mothers, that they had killed Young and Parker, and their mothers convinced them to turn themselves in to the police.

On December 27, 1990, Shafer was charged by information with two counts of first degree murder and two counts of armed criminal action. A public defender was appointed to represent him, but for more than a year that attorney did not investigate or do any work on the case. Several other defense attorneys were appointed but did little, and some of them had to withdraw because of a conflict.

3

Meanwhile, Shafer found life in the county jail intolerable and pressured his attorneys to obtain a transfer.

A motion to transfer Shafer to another facility was eventually filed, alleging that correctional officers had not protected him from repeated sexual assaults by a fellow inmate, had frequently physically abused him, and had harassed him verbally with threats, curses, and questions about his sexual orientation. Although the court found that some of these allegations were probably true, it denied the motion to transfer because it seemed that the jail had taken steps to fix the problems and Shafer had provoked many of the confrontations.

Assistant public defender Susan McGraugh began to represent Shafer in February 1992, but in April he moved to proceed pro se, saying that he wanted to plead guilty and be sentenced to death. The state moved for a hearing on Shafer's motion and urged the court to grant it. The court convened a hearing on April 27, 1992, and then continued it so that a psychological exam could be completed.

Before the next hearing and without communicating with his attorney, Shafer contacted a police officer involved in the investigation and offered to confess. The officer went to the jail on July 23, 1992, and Shafer told him that he "wanted to take full responsibility for the shootings." After this conversation, the officer contacted attorney McGraugh who told him not to interview Shafer unless she was present. The next day the officer received another letter from Shafer that he would "give whatever is necessary," and the officer decided to speak with Shafer without notifying McGraugh. On that day Shafer gave a written and videotaped confession after signing a Miranda waiver. Shafer stated in the taped interview that he had been advised by counsel not to speak with the police, but that he wished to disregard that advice.

4

On the basis of Shafer's confession, the state reached a plea agreement with codefendant David Steinmeyer in which he agreed to plead guilty to two counts of felony murder in return for a recommended prison sentence of twelve years and six months. The same trial judge presided over the prosecutions of both Shafer and Steinmeyer, and he accepted Steinmeyer's plea and sentenced him on October 21, 1992 to the term recommended in his plea agreement.

Three days after Shafer's confession, the court reconvened the hearing on his motion to discharge counsel. Shafer testified that he wished to proceed pro se and expressed frustration with what he perceived to be ineffective and inattentive counsel. He also stated that he was unsure whether he would "plead guilty to life without parole" because his purpose in seeking to waive counsel and plead guilty was to receive the death penalty. At the request of McGraugh, who was still counsel of record, the court took judicial notice of the fact that the state had not yet filed notice of any aggravating circumstances, which are required under Missouri law in order to impose the death penalty. The prosecutor asked Shafer whether he believed that his recent confession contained aggravating circumstances, and he said that he did.

Expert evidence regarding Shafer's mental state was also received. The court took judicial notice of the report of Dr. Terrance Kukor, the psychologist who had conducted Shafer's initial competency evaluation. Dr. Kukor had stated in his report that Shafer did not suffer from a mental disease or defect that rendered him incapable of understanding the proceedings against him. Testifying live at the motion hearing was Dr. Daniel Cuneo, a psychologist engaged by defense counsel to conduct the evaluation ordered by the court at the April 27 hearing. Dr. Cuneo testified that he had examined Shafer on May 21 and that Shafer suffered from nonspecified personality disorder, making him prone to impulsive decision making and severely impairing his ability to waive counsel and represent himself. Dr. Cuneo predicted "He's going to bounce from one day to the next to the next and when it's all over, he's going to come back and say, 'I want a change,' and he won't have that option then."

5

At the close of the hearing, Shafer requested another psychological evaluation, and one was ordered by the court.

Four days later on July 31, 1992, the state filed a notice to seek the death penalty and a notice of statutory aggravating circumstances. The latter notice charged that (1) each murder had occurred during the commission of another homicide, (2) the murders were committed for the purpose of receiving money or items of value from the victims, (3) they were committed during a robbery, (4) the victims were killed as a result of their status as witnesses or potential witnesses, and (5) the murders were committed to conceal a felony. Since Shafer's attorney was not a designated death penalty counsel, Herman Jimerson was appointed to replace her.

Dr. Richard Gowdy conducted the psychological evaluation ordered at the July 27 hearing, and he issued a report on September 15, 1992. Although Dr. Gowdy's report stated that he found Shafer competent to waive his right to counsel, he did not offer any opinion on the legally separate question of whether Shafer's mental condition impacted his ability to make knowing, voluntary, and intelligent waivers of his rights. Since Dr. Kukor also had not addressed this issue, the only expert opinion was provided by Dr. Cuneo, who had testified that Shafer's ability to waive counsel and represent himself was severely impaired.

The reconvened hearing took place on January 4, 1993. This proceeding lasted less than two hours, and during that span of time Shafer was permitted to waive his right to counsel and to represent himself, to waive his right to a jury trial with all associated rights, to plead guilty, and to proceed immediately to the penalty phase at which he also waived his rights and requested a sentence of death. During this same short hearing, the court accepted Shafer's waivers and guilty pleas, found all aggravating circumstances advanced by the state, and sentenced Shafer to death.

6

At the outset of the hearing Herman Jimerson was still defense counsel, and he protested that Shafer was not competent to make these decisions—for "a person cannot make an informed decision to plead if that decision is based on some irrationality." Counsel argued that the circumstances of Shafer's jail situation were causing him to proceed irrationally, but the court appeared to interpret the argument to relate only to the competency issue decided earlier. It said that Shafer had been found competent and that a defendant is competent to proceed "if after being advised of all his legal rights, he fully understands what he's doing." The court indicated it had no further concern about Shafer and informed him he could go to trial between March 22 and April 2, 1993 if he did not want to change his pleas.

In addressing the rights Shafer would be giving up by proceeding without counsel the court told Shafer: "it would be to your advantage to have an attorney, as the Court believes everyone should be represented by counsel to get legal advice, but this is your decision" and "by entering a guilty plea, any objections in the future that you may have against any of your attorneys is being waived." The court followed with a statement that it believed Shafer knew what he was doing, and then asked, "[d]o you feel you know what you're doing?" Shafer responded, "Yes, I do." The court then granted his motion to discharge counsel and to proceed pro se.

Jimerson, who had been ordered to remain as standby counsel, spoke up to raise questions about the prospective penalty phase. He asked the court to appoint an attorney to present mitigating evidence at the penalty phase if Shafer's pleas were accepted, and the court responded by telling Shafer he had a right to an attorney at each of two stages, for both the guilt and the sentencing phases. Then it asked him whether he wished to waive counsel for the "second stage of the proceedings." Shafer stated that he did not understand, and the district court modified its question to "Do you wish to waive counsel through all stages?" Shafer replied "I haven't decided. I'm waiving counsel now. What I do at a later stage, I haven't decided, but at this point … I think that I will waive counsel through all stages and all appeals." The court

7

explained that the appeals are "something else" so it was only asking whether Shafer wanted an attorney to present evidence on his behalf at sentencing. Shafer stated "I think I could do that myself," and the court asked if that was what he wanted to do. Shafer said yes.

Next the court asked whether Shafer understood that by pleading guilty he would waive the right to a jury trial and associated rights to remain silent, to subpoena witnesses, to cross examine witnesses, and to be presumed innocent unless proven guilty beyond a reasonable doubt. Shafer was asked in addition whether he also intended to waive counsel at the sentencing stage, and the court read the charges against him and the penalties they carried. The court did not, however, explain the elements of first degree murder, possible defenses to the charges such as diminished capacity, the possibility of being convicted for lesser included offenses, or the possibility of receiving lesser sentences than death or life in prison.

After the court accepted Shafer's confession as the factual basis for his pleas, the prosecutor reported that there was an inconsistency between Shafer's confession and the physical evidence in the case. Forensic analysis showed that the bullets recovered from the victims did not match the .22 caliber revolver Shafer said he had taken from his sister's closet and used in the killings. Both Shafer and Jimerson stated that they had been unaware of this exculpatory evidence, and Shafer complained that the prosecutor had failed to comply with discovery requests "quite a few times." He went on to say "I'm sorry that their tests weren't accurate, but I know that was the gun." The court inquired whether Shafer understood that he had a right to discovery and that it would be waived if he pled guilty. Shafer said that he understood and wanted to plead guilty, and the court then accepted his pleas to all counts.

The sentencing phase followed and took little time. First, the court announced that "[a]t this time it's necessary to proceed to sentencing." It told Shafer that he had

a right to be represented by counsel and to a jury trial for the sentencing phase and asked whether he wished to "continue to waive" those rights. Shafer said yes, and the court accepted these waivers after briefly inquiring whether anybody had "forced, coerced, threatened or abused" him. Shafer also waived his right to introduce any mitigating evidence, and he made no statement with respect to sentencing—other than to ask the court to consider several letters of his requesting the death penalty. The prosecutor asked the court to consider Shafer's confession as the factual basis for the aggravating circumstances necessary to impose the death penalty, and the court found that all five aggravating circumstances had been established beyond a reasonable doubt.

Next the court said it was "prepared to proceed with sentencing today. Do you wish the Court to proceed with sentencing today?" Shafer asked, "do I have an option?" The court responded that it was "prepared to proceed today if you wish to proceed." Shafer replied that he would, and the court sentenced him to death on each count of first degree murder and to life in prison for each count of armed criminal action. Jimerson objected that Shafer's rights under both the federal and state constitutions had been violated, but the court ruled that he had no standing to object.

On the same day Shafer wrote a letter to the trial court requesting it to help him resolve discovery disputes with the prosecutor. He called an assistant public defender shortly after the hearing, expressing surprise that he was still in jail and that the earlier proceeding had been "a mistake." Three weeks later he wrote another letter to the court stating he wanted to challenge his convictions to the fullest and asking for help in obtaining an attorney.

Shafer later filed a motion for post conviction review under Missouri Rule 24.035. He argued that his pleas and waivers had not been "knowing, voluntary, and intelligent" and that the sentencing judge had not sufficiently advised him of his rights. Shafer also complained that the police had taken advantage of his mental

9

illness and violated his Sixth Amendment right to counsel by eliciting his confession in the absence of his attorney even though she had specifically instructed them not to talk with him alone. The post conviction court held a three day evidentiary hearing and heard testimony regarding the effect of Shafer's mental health on his decision to waive his rights and plead guilty.

Five expert witnesses testified that Shafer's waivers had not been knowing, voluntary, and intelligent: Dr. Cuneo, Dr. Vliestra, Dr. Kohrs, Dr. Logan, and Dr. Fleming (by deposition). They based their opinions on diagnoses of borderline personality disorder, nonspecified personality disorder, depression, and bipolar disorder. These conditions were said to cause Shafer to make impulsive and emotional decisions, to have frequent mind changes, and to be unable to consider rationally the consequences of his actions.[3] No expert testified that Shafer's pleas and waivers had been knowing, voluntary, and intelligent. During his testimony Dr. Kukor admitted that he had neither analyzed nor determined whether Shafer could knowingly, voluntarily, and intelligently waive his rights or plead guilty.

The postconviction court denied Shafer's motion to vacate or set aside his convictions, but it ordered that he be resentenced because of deficiencies at the penalty phase. Resentencing was necessary it concluded because 1) no presentence investigation report had been ordered or prepared before the death sentence had been imposed, and 2) Shafer's waivers, of counsel at the sentencing stage and of his right to present mitigating evidence, had not been knowing, voluntary, and intelligent. The

---

[3]In the opinion of these experts, Shafer's condition resulted from a chaotic and violent childhood, including physical abuse at home and repeated sexual abuse by a male neighbor. Shafer started using alcohol and drugs in the fifth grade and was twice confined to Kansas youth detention centers for theft and burglary. Psychological evaluations during juvenile detention revealed he had a low I.Q. and an impulsive approach to problem solving that did not "reflect on probable consequences."

proceedings at the guilt phase were found "barely sufficient" even though the trial court had failed to provide the type of warnings and information a reviewing court might "well determine … [were] required for a voluntary, knowing and intelligent waiver," because Shafer had been "intent … upon pleading guilty." Shafer's claims regarding his confession were denied on the ground that he had waived his Sixth Amendment rights when he spoke to the police without counsel present.

Both the state and Shafer appealed the decision, and their appeals were consolidated with his direct appeal to the Missouri Supreme Court. The supreme court applied a multifactor test adopted by the Eleventh Circuit in United States v. Cash, 47 F.3d 1083, 1088–89 (11th Cir. 1995), to determine whether Shafer's waivers were knowing, voluntary, and intelligent. It concluded that the trial court's colloquy with Shafer about his rights and the consequences of waiving them had been adequate if considered in light of his stated goal to plead guilty and receive a death sentence. See Shafer, 969 S.W.2d at 730–31. The trial court's failure to discuss available defenses or lesser included offenses before allowing Shafer to plead guilty was not dispositive because such information "made no difference to him at the time."[4] Id. at 733. In reaching these conclusions, the court expressly declined to consider Shafer's mental health because it regarded that factor as only relevant to whether he was competent to proceed, not as to whether he had made knowing, voluntary, and intelligent waivers and pleas. Id. at 729–30.

The supreme court denied all of Shafer's claims although it did not specifically discuss those related to his confession. It also reinstated the sentences originally

[4]The court also expressed its view that the rules requiring that a defendant be informed of defenses and lesser included offenses "are imposed by judicial decisions that find no direct textual support in the federal or state constitutions. Indeed, the body of case law that now surrounds these issues seems more revealing of judicial antipathy for guilty pleas than honoring a constitutional principle." 969 S.W.2d at 732.

imposed, concluding that the finding that Shafer was competent foreclosed his waiver arguments related to the penalty phase and that his claim about the failure to have a presentence report had not been properly raised in his motion for postconviction relief. See id. at 737–39. Shafer's petition for certiorari to the United States Supreme Court was denied.

Shafer then filed this petition seeking a writ of habeas corpus in the Eastern District of Missouri. After briefing and a hearing, the district court concluded that the Missouri Supreme Court had unreasonably applied clearly established federal law in ruling that Shafer's waivers of the right to counsel at the guilt and sentencing phases, his guilty pleas, and his waiver of the right to introduce mitigating evidence had not been knowing, voluntary, and intelligent. See Shafer, 168 F. Supp. 2d at 1066–87. It also held that the supreme court had unreasonably determined the facts in light of the evidence in concluding that the trial court had considered mitigating circumstances before imposing the death penalty. See id. at 1091–93.

The court granted a conditional writ, to become permanent unless the state permits Shafer "to withdraw his plea of guilty and commences proceedings to afford [him] a trial." Id. at 1094. The district court denied Shafer's other claims for relief. The rejected claims included allegations that his confession had been obtained in violation of the Sixth Amendment, that he had received ineffective assistance of counsel before discharging his attorney, and that his due process rights had been violated by an ex parte conversation between the judge and prosecutor sometime before the plea hearing during which the judge said in advance that he intended to accept Shafer's pleas.[5] See id. at 1061–94. The state appeals the grant of habeas relief, and Shafer cross appeals the denial of relief on the rejected grounds.

---

[5]The district court also rejected Shafer's claims that his death sentence was disproportionate and that the aggravating circumstances found by the trial court were invalid. These issues were not included in the certificate of appealability.

II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court adjudication

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C.§ 2254(d).  The "contrary to" clause is satisfied if a state court has arrived "at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrives at the opposite result.  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  A case cannot be overturned merely because it incorrectly applies federal law, for the application must also be "unreasonable."  See id. at 411.  A federal district court's conclusions of law in deciding a habeas petition are reviewed de novo, but its findings of fact are reviewed for clear error.  See Simmons v. Bowersox, 235 F.3d 1124, 1130 (8th Cir. 2001).

A.

Although a criminal defendant has a constitutional right to represent himself, the Supreme Court has clearly established that the presiding court must undertake a

thorough colloquy with the defendant before permitting him to proceed in this way. The colloquy must inquire into his understanding of the right and must warn him of the dangers involved in order to ensure that he has full knowledge of the consequences:

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits …. [H]e should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."

Faretta v. California, 422 U.S. 806, 835 (1975) (citations omitted).

The Faretta knowing and intelligent requirement for valid waivers arose in a case in which the defendant sought to represent himself at trial, see id. at 809–11, but similar care must be taken to ensure that a defendant who wants to waive counsel and plead guilty is acting knowingly and intelligently. See Von Moltke v. Gillies, 332 U.S. 708, 723–24 (1948). In Von Moltke the Supreme Court instructed that the presiding judge must ensure that a defendant's waiver of counsel is "intelligent and competent" before he may proceed to plead guilty. Id. at 723. A conclusory statement by the defendant that he is aware of his rights is not sufficient assurance, for a valid waiver requires "an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." Id. at 724. To "make certain that an accused's professed waiver of counsel is understandingly and wisely made," a trial judge must undertake a "penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." Id.; see also North

14

Carolina v. Alford, 400 U.S. 25, 31 (1970) (guilty plea that is not "voluntary and knowing" violates due process).

The record reveals that the trial court asked few questions in this capital case with respect to Shafer's waiver of counsel for the guilt phase and did not fully inform him about his possible options or the choices he faced. The court began by asking Shafer whether he understood that a letter he had submitted was a request to waive counsel and plead guilty. Shafer answered affirmatively, and the court stated that it "believes you know what you're doing. Do you feel you know what you're doing?" Shafer replied "Yes, I do." Under law clearly established by the Supreme Court a trial court cannot accept a defendant's mere assurance that he has been informed of his right to counsel and desires to waive it, however. See Von Moltke, 332 U.S. at 724. Here, the court asked few questions and never probed beneath the surface of Shafer's declaration that he wanted to waive his right. This is not the type of "penetrating and comprehensive examination" that Von Moltke requires, id., especially when the trial court suggested the answer to its own question by assuring Shafer that it believed he knew what he was doing.

A trial court also has responsibility to ensure that the defendant is "aware of the dangers and disadvantages of self-representation" so that his "choice is made with eyes open." Faretta, 422 U.S. at 835. The court provided only two warnings before Shafer waived counsel at the guilty plea phase. The court told Shafer that "it would be to [his] advantage to have an attorney," and warned that by waiving counsel he would be giving up the right to attack the performance of his attorneys. Simply telling Shafer that it would be to his advantage to have an attorney did not advise him of specific dangers or limitations related to self representation. The supreme court's conclusion that this extremely limited exchange was adequate and amounted to the type of warnings required by the Supreme Court precedents was not a reasonable application of clearly established federal law.

15

The trial court's colloquy with Shafer regarding his waiver of counsel for the sentencing phase was even less exacting. After Shafer was allowed to discharge counsel and proceed pro se, the court asked him whether he intended to waive counsel for the sentencing phase as well. Shafer first said "I haven't decided," and that he was waiving counsel "now" but was undecided about what to do at "a later stage." After he went on to say that he thought he would "waive counsel through all stages and all appeals," the court explained that appeals were not then the question. The issue was whether Shafer wanted an attorney to present evidence on his behalf at sentencing. The court made no attempt to clarify Shafer's inconsistent statements or to explain other services of counsel at the sentencing phase of a capital case. It just repeated its question whether Shafer wished to represent himself at sentencing, and Shafer said yes.

The topic of waiver of counsel for the sentencing phase came up again after Shafer pled guilty to all charges. The court asked Shafer whether he wished to "continue to waive" counsel, and then asked a series of questions focused entirely on whether anyone had coerced Shafer to make that decision. The court did not explain the dangers and disadvantages of waiving counsel at the sentencing phase or the steps that an attorney could take to help Shafer, and it failed to conduct a probing inquiry into his understanding of the right he was waiving. Moreover, the court implied that Shafer had no choice but to proceed immediately to sentencing—it said at one point that it was "necessary" to proceed and later responded to Shafer's question whether he had an option to delay sentencing by saying that it was ready to proceed if Shafer was. The supreme court's conclusion that the court's brief exchange with Shafer was constitutionally sufficient for a valid waiver of counsel at sentencing was an unreasonable application of Faretta and Von Moltke.

The court's colloquy with Shafer was also inadequate to ensure that he was making an informed decision to plead guilty. Although the court read the charges against Shafer and informed him that by pleading guilty he would waive rights

16

associated with a jury trial, it failed to mention the possibility of defenses (even after the prosecutor revealed the exculpatory ballistics report). It did not inform Shafer about the possibility of lesser included offenses or the possibility of receiving sentences other than death or life in prison. The latter information would have been especially important to Shafer, as the record indicates that he was under the impression that his only alternative to the death penalty was life in prison, which he considered unbearable because of his experiences in jail. During the hearing he even said he was unsure whether he would "plead guilty to life without parole" as opposed to death, but the court did not explain that there could be other possible outcomes. Clearly established federal law, however, required the court to discuss precisely these things. The Supreme Court specified in Von Moltke that a defendant must be made aware of the "range of allowable punishments …, possible defenses …, and circumstances in mitigation thereof" before he can be allowed to waive counsel and plead guilty, 332 U.S. at 724, and McCarthy v. United States, 394 U.S. 459, 466 (1969), requires that a defendant understand the law in relation to the facts in order for a plea to be valid.

The record also indicates other misunderstandings of Shafer. For example, he explained his desire to plead guilty in this way: "it would save the … State a lot of money in the cost of a trial, and if they didn't get a conviction, you know, they would just have to start all over. This way it would be a sure conviction for the State." No attempt was made to correct this obvious lack of understanding about a defendant's objectively important rights, such as the state's burden of proof and double jeopardy. There were also other indications that Shafer did not comprehend the consequences that would follow from his actions. He wrote a letter to the court on the same day his pleas were accepted and he was sentenced to death, in which he asked for help in resolving discovery disputes with the prosecutor.[6] Shafer in fact made his decisions

_____

[6]He also called an assistant public defender shortly after the hearing to say it had been a "mistake" and to express surprise that he was still in jail. Three weeks

17

to waive his rights and plead guilty without having received responses to some of his discovery requests or being fully informed about the facts. It was only after he had waived counsel, and after his confession had been accepted as the factual basis for his pleas, that the prosecutor revealed that ballistic tests showed that the bullets removed from the victims did not match the gun Shafer said he had used.

The importance of the trial court's omissions at the colloquy is magnified in significance when Shafer's mental condition is taken into consideration. There was undisputed state court evidence from a number of experts that Shafer suffered from depression, personality disorders, and other psychological problems that caused impulsive and irrational decision making and frequent mind changes. The state's expert admitted that he had not even attempted to determine whether Shafer could knowingly and intelligently waive his rights and plead guilty. A thorough colloquy was even more important under these circumstances to ensure that Shafer could make knowing, voluntary, and intelligent decisions.

The supreme court declined to consider evidence of Shafer's mental condition before concluding that his waivers and pleas had been knowing, voluntary, and intelligent because it believed that reference to that condition was "tantamount to a claim that he was not competent to waive counsel." It cited two psychological evaluations finding him competent to stand trial and Godinez v. Moran, 509 U.S. 389, 398–99 (1993), for the proposition that a defendant competent to stand trial is also competent to waive his right to counsel and plead guilty. See Shafer, 969 S.W.2d at 729.

Godinez stands for more than the cited proposition because in it the Supreme Court also distinguished findings of competency from the findings required for valid

later he wrote that he had been wrongly convicted and that he intended to challenge his conviction "to the fullest."

waivers.  Although there is no distinction between the competency required to stand trial and the competency to waive constitutional rights, the Court made clear in Godinez that a finding that a defendant is competent does not mean that a defendant has made a knowing and voluntary waiver:

> A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel.  **In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary.  In this sense there is a "heightened" standard for pleading guilty and for waiving the right to counsel,** but it is not a heightened standard of competence.

See id. at 400–01 (citations omitted) (emphasis added).  A presiding court must therefore employ a "heightened" standard to determine whether a defendant may constitutionally waive counsel and plead guilty.  As the Court indicated, a finding of "knowing" or "voluntary" is not equivalent to a finding of competency.  A two part analysis is required in order to determine if a particular waiver was valid.  The first question is whether the accused was competent—did he have the ability to understand the proceedings?  See id. at 400.  The second question is whether he made a knowing and voluntary waiver of his rights—did he actually understand the consequences of a particular decision?  See id.

The Supreme Court has explained that an inquiry into whether a waiver of rights is knowing, voluntary, and intelligent requires examination of "the particular facts and circumstances surrounding that case, including the background [and] experience … of the accused." Edwards v. Arizona, 451 U.S. 477, 482 (1981). Von Moltke cautioned similarly that "[a] judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which

such a plea is tendered." 332 U.S. at 724. The record evidence made Shafer's mental condition relevant to determining whether he understood the consequences of his decision.

Although courts are to "indulge every reasonable presumption" against waivers of counsel, Johnson v. Zerbst, 304 U.S. 458, 464 (1938), overruled in part on other grounds, Edwards, 451 U.S. at 482–87, in this case the state appellate court not only chose to disregard Shafer's mental health, it presumed that his decisions would have been the same even if he had received a full explanation of the law. The presumption was applied in favor of waiver instead of against it.

After a careful examination of the entire record, we conclude that the trial court's colloquies with Shafer, before he waived counsel, pled guilty, and proceeded immediately to the penalty phase where he was sentenced to death, fell far below the standards set by the United States Supreme Court. We therefore conclude that the state supreme court unreasonably applied clearly established federal law when it excused the inadequacies in Shafer's trial court proceeding.

The state raises a number of points about what federal law has been clearly established by the Supreme Court. It argues that Von Moltke does not qualify as clearly established federal law because it is an old plurality decision with unusual facts. The defendant in Von Moltke, a German woman accused of espionage during World War II, was denied access to counsel, received legal information only from FBI agents, and was interrogated for more than a month. 332 U.S. at 710–18. A judge unfamiliar with the case accepted her waiver of counsel and guilty plea during a short recess from another trial. Id. at 717. The facts of the case have not limited the impact of Von Moltke, however, for the Supreme Court has cited Von Moltke in a number of subsequent cases. E.g. Penson v. Ohio, 488 U.S. 75, 86–87 (1988); Patterson v. Illinois, 487 U.S. 285, 298 (1988). Our court has also had occasion to consider Von Moltke in the course of deciding cases. In Wilkins v. Bowersox, 145

20

F.3d 1006, 1013 n.5 (8th Cir. 1998), we observed that in Von Moltke "the Supreme Court established the requirement that a judge's inquiry regarding waiver of counsel must be comprehensive and probing." Moreover, there are other Supreme Court precedents which clearly establish the knowing, voluntary, and intelligent rule. See Godinez, 509 U.S. at 400, 401 n.12; Faretta, 422 U.S. at 835–36; Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942).

The state also argues that the supreme court reasonably applied the test for the validity of a waiver of counsel adopted by the Eleventh Circuit in Cash.[7] 47 F.3d at 1088–89. We must keep in mind, however, that in this habeas case AEDPA mandates that we focus on the requirements set by the Supreme Court, and in Faretta and Von Moltke that Court clearly established inquiry and warning requirements applicable to this case. Cash was a direct criminal appeal in which the defendant's waiver of counsel was held not to be knowing, voluntary, and intelligent because the court's colloquy was not specific or thorough enough, especially in light of the defendant's mental problems. Id. at 1089–90. One of the Cash factors is a defendant's mental health, and this factor tipped "the balance" for Cash. Id. at 1089. The court found no indication in the record that he understood his options and the full consequences of his waiver, concluding that his was not one of the "rare cases" where the lack of a sufficient colloquy could be overlooked. Id. at 1088–90. Since the record indicates that Shafer's mental condition would similarly have impacted his ability to make knowing and intelligent waivers, application of the Cash test should have included an examination of whether Shafer understood what he was doing.

[7]The Cash factors examine the defendant's (1) age, educational background, and physical and mental health; (2) contact with lawyers prior to trial; (3) knowledge of the nature of charges, possible defenses, and penalties; (4) understanding of procedural rules, evidence, and courtroom decorum; (5) experience in criminal trials; and additionally (6) whether standby counsel was appointed and aided the defendant; (7) whether there was mistreatment or coercion of the defendant; and (8) whether the defendant was trying to manipulate events. 47 F.3d at 1088–89.

In urging that the district court be reversed the state also cites <u>Hunter v. Bowersox</u>, 172 F.3d 1016, 1020–23 (8th Cir. 1999). In that case the petitioner had also waived counsel, asked for the death penalty, and later claimed that his plea had not been knowing, voluntary, and intelligent because he had been depressed, affected by the conditions of his confinement, and wanted to die. <u>Id.</u> A significant difference in that case, however, was that the trial court's colloquy was not attacked for failing to provide sufficient warnings or for failing to inquire adequately into the petitioner's understanding. Moreover, in <u>Hunter</u> the supreme court considered the effect of the petitioner's mental health on his ability to make valid waivers before concluding that his plea had been "freely and voluntarily given with full knowledge." <u>Id.</u> at 1022. For these reasons <u>Hunter</u> is not apposite.

Shafer on the other hand urges that our decision in <u>Wilkins</u> should lead to affirmance of the district court. Although the facts there were very similar to our case, <u>Wilkins</u> was not decided under AEDPA. The petitioner there had been found competent to stand trial for murder and later moved to discharge counsel, stating that he wished to plead guilty and receive the death penalty. <u>Wilkins</u>, 145 F.3d at 1009. Instead of undertaking a probing analysis to determine whether Wilkins should be allowed to waive counsel and plead guilty, the trial court used "leading questions that failed to allow [him] to articulate his reasoning process," and failed to inform him of defenses, lesser included offenses, or "the full range of punishments that he might receive." <u>Id.</u> at 1012.

We concluded that this type of limited colloquy did not comply with the requirements of <u>Faretta</u> and <u>Von Moltke</u>. <u>Id.</u> at 1013. We also observed that the Missouri courts had not acknowledged undisputed expert testimony that Wilkins' waivers and pleas had not been knowing, voluntary, and intelligent. There was expert opinion in the record that he suffered from mental disorders causing him to make impulsive and irrational decisions, but the state courts had concluded that earlier competency findings satisfied any concern about his mental condition. <u>Id.</u> at

22

1013–15. We held, however, that the refusal to consider the impact of his mental disorders on his ability to make knowing and intelligent choices was contrary to Godinez and that his mental condition had prevented him from making knowing, voluntary, and intelligent waivers. Id. We affirmed the district court's grant of habeas relief and required that Wilkins be given an opportunity for trial because there had been an inadequate colloquy in the trial court and his mental health had not been considered. See id. at 1011.

Similar concerns are present in Shafer's case. Here the trial court omitted essential elements of the required colloquy such as available defenses and lesser included offenses. It relied on leading questions to determine whether Shafer understood what he was doing and did not help him to "articulate his reasoning process." See id. at 1012. Here too, the supreme court failed to consider the impact of Shafer's mental health on his understanding and the need for the court to comply fully with colloquy standards. This was despite undisputed expert testimony that Shafer was prone to make impulsive and irrational decisions without considering the consequences. Even though AEDPA did not apply to Wilkins, it is an important precedent for Shafer's case for it drew on the clearly established governing law and illustrates a reasonable application of the Supreme Court precedents in a factually similar case.

The rapid pace at which the trial court moved Shafer—from the question of waiving counsel to his decisions about changing pleas, and then on to the waivers at the penalty phase which resulted in an immediate imposition of the death sentence—skimmed over procedures meant to ensure that a defendant's rights are protected. Shafer was allowed to waive counsel at both the guilty plea and sentencing phases without a penetrating and comprehensive examination of his understanding, and without clear and specific information about his options or warnings about the consequences of his actions. See Von Moltke, 332 U.S. at 724. The trial court simply asked whether he thought he knew what he was doing and told

23

him that he would be better off with an attorney. Shafer was allowed to plead guilty without any assurance that he understood that there were legal defenses that might provide him an opportunity to avoid conviction of the charged offenses or options that might lead to a sentence other than life in prison or death, failures the state supreme court was willing to overlook because it assumed nothing would have affected his decisions. See Shafer, 969 S.W.2d at 733. The supreme court also failed to consider undisputed expert opinions regarding Shafer's mental health, signs that he did not understand his rights or the consequences of his actions, and the fact that he reached his decisions to waive counsel, plead guilty, and ask for the death penalty without being informed about the exculpatory ballistics evidence.

We conclude that the state supreme court unreasonably applied clearly established federal law when it determined that Shafer's guilty pleas and his waivers of counsel were knowing, voluntary, and intelligent. We therefore conclude that the district court did not err in granting relief and in ordering that Shafer be allowed to withdraw his pleas and waivers and be provided an opportunity to make fully informed decisions, starting with his decision whether to be represented by counsel.[8]

## B.

On his cross appeal Shafer argues that the district court erred by denying his claim that his confession should be suppressed because it was taken in violation of his constitutional right to counsel. He argues that the police violated his right to counsel by talking to him without permission from his attorney and that the supreme

---

[8]In light of this decision we need not consider additional grounds in the certificate of appealability which are now moot: 1) that the trial court failed to consider mitigating evidence before sentencing, and 2) that Shafer's waiver of the right to introduce mitigating circumstances was not knowing, voluntary, and intelligent. These issues relate to the original penalty phase, and the nature of the conditional writ makes it unnecessary to decide them.

court decision was contrary to and an unreasonable application of clearly established federal law.[9] The state responds that clearly established federal law permits waiver of the right to have counsel present during questioning if an individual has been informed of his rights. It points out that Shafer initiated the police contact, offered to confess, and confessed only after being informed of his Miranda rights.

Shafer claims that a confession is per se invalid whenever the state deliberately elicits incriminating statements in the absence of counsel after a defendant's Sixth Amendment right to an attorney has attached and he has obtained representation, and that the police violated this rule by interviewing him and obtaining his confession. He relies primarily on broad statements in two Supreme Court decisions, Massiah v. United States, 377 U.S. 201 (1964), and Maine v. Moulton, 474 U.S. 159 (1985). The Sixth Amendment was violated in Massiah by use of "evidence of [the defendant's] own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of … counsel," 377 U.S. at 206, and the Supreme Court explained in Moulton that the "police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." 474 U.S. at 171.

As the state points out, these cases are factually distinguishable because they did not present an issue of intentional waiver. In Massiah a codefendant allowed police to install a radio transmitter in his car and then asked questions of the defendant while authorities listened. 377 U.S. at 202–03. Similarly, in Moulton a cooperating codefendant wore a wire to record a conversation in which he enticed Moulton to make incriminating statements. 474 U.S. at 165–66. In both of these cases, the defendant had no idea that he was being interrogated at the instigation of

---

[9]The supreme court denied all of Shafer's claims, though it did not discuss his confession claim.

the police. Shafer, on the other hand, not only knew that he was speaking to the police, but intentionally initiated a conversation with them in the absence of counsel.

The right to counsel under the Fifth Amendment may be waived even after it has been invoked if "the accused himself initiates further communication … with the police." Edwards, 451 U.S. at 484–85. The Supreme Court has indicated on two occasions that the same waiver rule applies under the Sixth Amendment. See Patterson, 487 U.S. at 291 (indicating that waiver is permitted under Sixth Amendment if accused initiates discussion); Michigan v. Jackson, 475 U.S. 625, 635 (1986) (written waivers "are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis"). In this case there is no question that it was Shafer, not the police, who initiated the interview that led to his confession on July 24, 1992. Shafer contacted an officer involved in the investigation, both on that day and on the day before, to express his desire to talk and to confess.

Since Shafer initiated the interview, he could validly waive his right to counsel for the purpose of confessing if his waiver was knowing, voluntary, and intelligent. See Patterson, 487 U.S. at 292. Here, the record reflects that Shafer was adequately informed of his right to counsel, that anything he said would be used against him, and of the consequences of waiver before he signed Miranda waivers which he orally reaffirmed during his videotaped interview. Shafer also told police that his attorney had advised him not to speak to them but that he wished to disregard her advice and proceed with the interview in her absence. The warnings he received were sufficient to allow him to make an informed decision to waive his Sixth Amendment right to counsel. See id., at 292–93 (Miranda warnings sufficient to make accused aware of Sixth Amendment right to have counsel present during questioning and of possible

26

consequences of waiver).[10]  Although Shafer states in his brief that the police "exploited" his mental condition by allowing him to confess, he has never argued that mental illness interfered with his ability to understand what he was doing when he made his confession.  We cannot conclude on this record that the Missouri Supreme Court decision denying this claim was either contrary to or an unreasonable application of clearly established federal law.[11]

## III.

In sum, we conclude that the district court did not err in concluding that the state supreme court unreasonably applied clearly established federal law in finding that Shafer's waivers of counsel and guilty pleas were knowing, voluntary, and intelligent.  The district court also did not err by refusing to suppress Shafer's confession after concluding that the state court's rejection of his Sixth Amendment claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  Shafer is therefore entitled to the writ granted by the district court but to no other relief.  The judgment of the district court is affirmed.

---

[10]Although the Court indicated in Patterson that it might have reached a different result if the defendant had been represented at the time he spoke with the police, 487 U.S. at 290 n.3 (citing Moulton, 474 U.S. at 176), there are no cases in which it has reached such a conclusion. It was thus not unreasonable for the Missouri court to apply Patterson to a represented defendant who initiated contact with police for the purpose of confessing, was informed of his rights, and proceeded to confess.

[11]Shafer raises two additional arguments on his cross appeal: 1) that he received ineffective assistance of counsel because his attorneys failed to investigate potentially exculpatory evidence or to develop available theories of defense before they were relieved, and 2) that he was denied due process by an ex parte conversation between the trial court and the prosecutor in which the judge indicated in advance of the hearing that he was likely to accept Shafer's pleas (and possibly that he would grant Shafer's wish for the death penalty). These claims are moot at this point and need not be addressed.

A true copy.

Attest:

    CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.