# United States Court of Appeals
## For the Eighth Circuit
_____

No. 16-1840
_____

Showin Keon Davis

*Petitioner - Appellee*

v.

United States of America

*Respondent - Appellant*
_____

Appeal from United States District Court
for the District of North Dakota - Fargo
_____

Submitted: March 10, 2017
Filed: May 26, 2017
_____

Before LOKEN, MURPHY, and BENTON, Circuit Judges.
_____

BENTON, Circuit Judge.

After rejecting two plea offers, Showin K. Davis pled guilty to one count of conspiracy to possess with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district court sentenced him to 120 months' imprisonment. Davis moved to vacate the conviction and sentence under 28 U.S.C. § 2255, claiming ineffective assistance of counsel. The district court granted the motion in part, ordering the government to reoffer an earlier plea deal. The government appeals.

Having jurisdiction under 28 U.S.C. §§ 1291 and 2253, this court reverses in part and remands.

I.

Davis was indicted for conspiring to distribute controlled substances, a charge with a mandatory ten-year sentence. The government made three plea offers; the second and third are at issue here.

The first, offered months before trial, was a standard cooperation agreement. Daniel E. Hopper, Davis's appointed attorney, explained the agreement to him. He rejected it.

A week before trial, the government offered Davis a five-year deal (the second offer). Hopper recommended he take it, explaining a jury likely would find him guilty. He rejected it. They again discussed the five-year deal the first morning of trial. Davis showed no interest in it.

On the second day of trial, the government made a third offer. It had a mandatory ten-year sentence, but limited the type and quantity of controlled substances attributable to Davis. He accepted. The district court sentenced him to 120 months.

Davis moved to vacate his conviction and sentence under 28 U.S.C. § 2255, alleging ineffective assistance of counsel. He asserted four claims. The district court found they

> cluster[ed] around two separate theories: (a) during the course of the
> pretrial proceedings Hopper did not afford Davis an  opportunity to
> review discovery and did not file any pretrial motions; and (b) Hopper

-2-

failed to provide Davis with the information to make an informed decision on the proposed plea agreement and ultimate change of plea.

After an evidentiary hearing, the court rejected the first theory, but granted the motion on the second:

> While Hopper's representation was not entirely ineffective, during the immediate pretrial preparation phase, Hopper failed to effectively communicate the law of conspiracy in a way that Davis was capable of comprehending; Hopper failed to explain the risks and benefits of the plea offer in a way that Davis could comprehend; and Hopper misinformed Davis of his eligibility for the safety valve. These failures and conveyance of misinformation constitute ineffective assistance of counsel within the meaning of Strickland v. Washington.

The court vacated the conviction and sentence. It ordered the government to reoffer the five-year deal. The government appeals.

This court reviews de novo ineffective assistance claims under § 2255, and the underlying factual findings for clear error. *United States v. Regenos*, 405 F.3d 691, 692-93 (8th Cir. 2005). To establish ineffective assistance during plea negotiations, the petitioner must show "'counsel's representation fell below an objective standard of reasonableness'" and "that such deficient performance prejudiced" the defense. *Id.* at 693, *quoting Strickland v. Washington*, 466 U.S. 668, 688 (1984). Prejudice requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "[S]crutiny of counsel's performance must be highly deferential." *Hamberg v. United States*, 675 F.3d 1170, 1172 (8th Cir. 2012) (internal quotation marks omitted). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Taylor*, 258 F.3d 815, 820 (8th Cir. 2001), *citing Strickland*, 466 U.S. at 689.

II.

The district court concluded Hopper was ineffective because he did not communicate "the law of conspiracy" and "the risk and benefits of the plea offer in a way that Davis could comprehend." The court found:

(1) "At the outset, it should be noted that the claim that Hopper never spent a sufficient amount of time consulting with Davis would be easily disposed of in the ordinary case. Hopper spent more than 27 hours in conference with Davis over the course of pretrial preparation. Under ordinary circumstances, this length of time is typically sufficient to meet with a criminal defendant in a case of this nature."

(2) "The record does not make plain, but it appears that from the outset that Davis had limited interest in cooperating with the prosecution. It is clear that from the very earliest stages of his representation of Davis, Hopper tried to convince Davis that cooperation was the best strategy. The record also makes plain that Davis believed that the United States would have difficulty both positively identifying him as a person involved in the conspiracy and establishing a role for him in the conspiracy. It is equally clear that upon review of the discovery that Hopper had reached a different conclusion."

(3) "[O]n March 4, 2013 . . . Davis met with Hopper and Hopper's senior partner Cash Aaland for two hours in the morning and another three and a half hours in the afternoon for a total of 5.5 hours. During this meeting a comprehensive review of the discovery, the likelihood of success on the merits, and a discussion of a possible plea agreement took place. Davis rejected the idea of a change of plea and indicated a desire to proceed to trial."

(4)  "[O]n March 25, 2013, approximately ten days prior to trial . . . [there was a] meeting last[ing] four hours [which] included a further review of the evidence and a plea offer."

(5) "Davis spent more than 27 hours in consultation with Hopper.  The record makes plain that Davis had approximately five hours on March 4, 2013, to review the discovery and another four hours on March 25, 2013.  It is also apparent from the time records that Hopper had numerous lengthy phone conferences with Davis discussing the case and the evidence against him."

(6) "The record is plain that Davis was given sufficient opportunity to review the discovery and he was fully informed about the evidence that would have been presented to support the charge at the change of plea hearing."

(7)  "Davis's lawyers, Hopper, Lange, and Aaland each forcefully attempted to explain the law of conspiracy and how Davis might be convicted, paying particular attention to the possible penalties he faced."

(8) "It is apparent that Hopper along with his partners Aaland and Lange attempted to explain the law of conspiracy in ways that Davis could understand."

(9) "During [the time leading up to the rejection of the plea offer], Hopper reviewed discovery and offered up explanations of potentially viable defenses. He also informed Davis of the difficulties that an identification defense might present. The discussions at this point were essentially moot since Davis had indicated an unwillingness to cooperate with the government and was focused on the merits of an identification defense. Based on the record, the court cannot say that Hopper provided ineffective assistance of counsel at this stage of the proceedings."

(10)  "Davis is not the first defendant to fail to hear the message being delivered by his lawyer."

Despite these findings, the court concluded Hopper "failed to effectively communicate the law of conspiracy in a way that Davis was capable of comprehending," because:  "(1) Davis suffers from mental illnesses and conditions that impair his ability to focus and to make reasoned decisions, something his lawyers should have been aware of and taken into account; and (2) Hopper's communication style and heavy reliance on telephone communication did not mesh well with Davis's difficulties."

i.

The district court based its first finding—that Davis suffers from mental illness that impaired his ability to understand repeated advice from Hopper and make reasoned decisions (and that Hopper should have known this)—primarily on mental health records presented to support Davis's 2255 motion.  The records do not support this finding.

The records show:  (1) Davis was admitted to the hospital two months before trial for a possible overdose/suicide attempt; (2) he was prescribed antidepressants (Zoloft and Trazodone); and (3) at discharge he was diagnosed with malingering, anxiety disorder, mood disorder, and cannabis dependence.  The examining doctor said:  "Fund of knowledge, insight and judgment are fair.  He is oriented to time, place and person. Attention and concentration are intact, as well as recent and remote memory."  The doctor also reported: "The patient does not give any reliable information"; "I strongly believe that patient is malingering, and he is trying to evade his legal problems"; "He is just not being truthful here and I believe that he is malingering"; and "Patient will be discharged on the same day of admission." Reviewing the records, the district court concluded, "Davis suffers from serious

mental health problems" including "problems with attention, anxiety (including agoraphobic traits), depression, and learning" and this mental illness made it difficult for Davis to understand "what his lawyers were trying to tell him."

The district court clearly erred in finding that Davis suffered from mental illness that impaired his ability to understand legal advice and make reasoned decisions. The mental health records show no learning or comprehension limitations. To the contrary, the records show his "[a]ttention and concentration are intact" and he understood an array of topics, including "patient contract agreements," "necessity, risks, benefits, and possible side effects of medications," "individualized treatment plan[s]," "variables affecting anticipated length of stay," and "outcomes that must be achieved prior to discharge." If anything, the records show he has a history of lying about his mental health in order to evade legal problems.

The finding also contradicts the district court's earlier findings that Davis was competent to plead guilty and be sentenced. At the change of plea, the court found Davis competent: "I see a person here who does seem to be functioning well within the bell curve who does seem to understand the proceedings, does seem to be in a position to assist his counsel in his defense and I find that he is competent to proceed." *See* ***Shafer v. Bowersox***, 329 F.3d 637, 650 (8th Cir. 2003) (the question "whether the accused was competent" means "did he have the ability to understand the proceedings"). And although the court now believes that "Davis was actually suffering from more profound mental illness than the court understood at the time of the change of plea," it affirmed its competency findings in the 2255 order. Thus, the court still believes Davis was able to understand legal advice and make reasoned decisions the day he pled guilty.

The district court also clearly erred in finding that Hopper "should have known" that Davis was not able to understand legal advice or make reasoned decisions. "A fair assessment of attorney performance requires that every effort be

made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to *evaluate the conduct from counsel's perspective at the time*." **Strickland**, 466 U.S. at 689 (emphasis added). Davis's mental illness provides a basis for ineffective assistance of counsel only if Hopper knew or should have known of it at the time. *See **Crenshaw v. Wolff***, 504 F.2d 377, 380 (8th Cir. 1974) (affirming denial of post-conviction relief where "there was no evidence that the trial attorney knew or should have known about petitioner's possible incompetency").

There is no evidence that Hopper should have known that Davis's mental health issues—not his steadfast denial of wrongdoing—were the reason for his failure to follow Hopper's legal advice. *See **Jones v. Barnes***, 463 U.S. 745, 751 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty."). To the contrary, the evidence shows Hopper had no reason to believe Davis could not understand legal advice or make reasoned decisions. Davis testified he is the "kind of a person where I don't like sharing information about my well-being meaning that I take medications." All parties testified to his competence on the day he pled guilty, a week after he initially rejected the 5-year plea offer and a day after he rejected it a second time.[1] At the change of plea hearing, Davis testified that he understood "the nature of the charge" against him, "the potential penalties . . . including the 10-year mandatory minimum

---

[1]At the evidentiary hearing, Davis testified that the first time he reviewed the five-year offer was April 2, the first day of trial. The district court did not credit this testimony:

> On March 25, 2013, the United States extended an offer that would have allowed Davis to plead to a reduced quantity thus reducing the mandatory minimum sentence from ten years to five years. Davis spent four hours with Hopper on March 25 reviewing discovery and discussing the plea offer. Following those discussions, Davis rejected the plea offer.

-8-

sentence," his right to a jury trial, and the unavailability of parole. Hopper similarly testified he had not "seen anything that would cause [him] to question [Davis's] legal competence." (Davis later testified he did not know whether Hopper knew about his anxiety the first day of trial, and he not ask Hopper to help him with it). At the plea hearing, the district court found him competent to plead guilty:

> Here's what I think I've seen and observed. The defendant has related that he has some history of mental illnesses and that he's taking medications for them; that he was taking his medications; that he skipped yesterday. After he took his medications that things seemed clearer to him and that he wants to plead guilty. That to the Court seems to be a rational decision at this point.
>
> . . . .
>
> I see a person here who does seem to be functioning well within the bell curve who does seem to understand the proceedings, does seem to be in a position to assist his counsel in his defense and I find that he is competent to proceed.

The court reiterated these findings in its 2255 order: "It is also clear that at the time he entered his plea, Davis was in a position to understand the charge against him, the penalties that he faced, his constitutional and statutory rights, and that he was in a position to assist his lawyer in his defense." At sentencing, the district court did not question his competence.

The record shows that when he pled guilty, Davis, Hopper, and the district court all believed Davis was competent to understand legal counsel and make reasoned decisions. The court's finding that "Davis suffers from mental illnesses and conditions that impair his ability to focus and to make reasoned decisions, something his lawyers should have been aware of and taken into account" is thus influenced by "the distorting effects of hindsight," and is clear error. *Strickland*, 466 U.S. at 689.

The second finding—that "Hopper's communication style and heavy reliance on telephone communication did not mesh well with Davis's difficulties"—does not provide a basis for ineffective assistance of counsel. First, it is a close call whether this finding is supported by the record. The court described Hopper's communication style:

> The court is familiar with Hopper, a capable and competent lawyer. His personal style of communication is soft-spoken, inferential, and non-confrontational. He is a person who prefers to provide information and allow the listener to draw his or her own conclusions. If the listener has difficulty reaching the most apparent conclusion, Hopper tends to conversationally and rationally, and sometimes repetitively, explain the conclusion and the ramifications.

The court also found that Hopper "attempted to explain the law of conspiracy in ways that Davis could understand." These findings show that Hopper thoroughly and repeatedly explained the law, and yet Davis continued to reject plea offers. The district court does not say how Hopper more thoroughly could have explained the law. In fact, the court recognized that many of Hopper's explanations were moot because Davis was unwilling to cooperate:

> During this remote preparation period, Hopper reviewed discovery and offered up explanations of potentially viable defenses. He also informed Davis of the difficulties that an identification defense might present. The discussions at this point were essentially moot since Davis had indicated an unwillingness to cooperate with the government and was focused on the merits of an identification defense.

It is hard to reconcile how Davis could have been "focused on the merits of an identification defense" without understanding the law of conspiracy generally. The court also recognized Hopper was not ineffective during other phases of the trial:

"The record is plain that Davis . . . was fully informed about the evidence that would have been presented to support the charge at the change of plea hearing." It similarly is hard to reconcile how Hopper could have "fully informed" him "about the evidence that would have been presented to support the charge" but not clearly explained the law of conspiracy underlying it.

Regardless, the fact that Hopper's communication style—"conversational[], rational[], and sometimes repetitive[]—did not "mesh" well with Davis is insufficient to find ineffective assistance of counsel. *See Lindhorst v. United States*, 658 F.2d 598, 603 (8th Cir. 1981) (denying 2255 motion, acknowledging that while "the attorney could have explained [the case] in greater detail," "the failure to more fully discuss the case does not constitute a breach of the duty to act as a reasonably competent attorney").

Evaluating Hopper's "conduct . . . from [his] perspective at the time," *Strickland*, 466 U.S. at 689, Davis cannot meet his "heavy burden" of showing that Hopper was ineffective in explaining conspiracy law. *See DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000). The district court erred in granting the motion on this basis.

III.

The district court also concluded Hopper was ineffective because he did not correctly advise Davis about the safety-valve exception to the mandatory minimum 10-year sentence under 18 U.S.C. § 3553(f). On the morning of the plea, Hopper argued that Davis's criminal history was overrepresented, implying the safety valve may reduce the sentence. The district court disagreed:

> The Eighth Circuit case law says that we can't find overrepresentation
> as a basis to get to the safety valve. And so all that's going to happen
> on the safety valve analysis is we're going to go and count the points.

And it looks to me like he's got four one-point offenses, and if he's got four one-point offenses he's certainly going to be outside a Criminal History Category I. He's going to be in Criminal History Category III, and so he's clearly not safety valve eligible if that all scores up the way that it looks. I mean, in which case the mandatory minimum is going to apply. What he gains then is simply the benefit of the two-level downward departure for acceptance.

The court suggested Hopper and Davis speak with the probation officer about his criminal history. After a fifteen-minute recess, Hopper informed the court that Davis still wanted to plead guilty.

At the evidentiary hearing, Davis testified that even after the district court said he was not safety-valve eligible, Hopper promised him otherwise. In one part of its order, the district court found this testimony credible: "At the evidentiary hearing, Davis credibly testified that during the break Hopper and Jesse Lange, a senior partner of Hopper's, told him that they would get AUSA Chris Myers to accept the safety-valve because the prior offenses were minor." Later, however, the court noted the testimony was "directly contrary" to his plea colloquy:

While the record of the plea hearing makes plain that Hopper was uninformed of the nature of the safety-valve, the court informed Davis that it was unlikely that he would qualify for the safety-valve. Davis admitted that his decision to accept the plea was to avoid an increase in the drug quantity attributable to him. While he now claims that he was promised by Hopper that Hopper would get the prosecutor to agree to safety-valve eligibility, Davis's contention is directly contrary to the plea colloquy where he indicated that no other promise or threats had been made. Hopper provided effective assistance of counsel during the plea hearing.

Thus, it is not clear whether Davis believed he was safety-valve eligible when he pled guilty. Regardless, the district court did not err in finding Hopper deficient in failing to explain the safety-valve exception. *See **United States v. Langmade***, 236 F.3d 931,

932 (8th Cir. 2001) (reducing a defendant's criminal history category based on overrepresentation "does not delete criminal history points for the purposes of the safety valve").

Based on Hopper's misunderstanding of the safety valve, the district court ordered the government to reoffer the five-year plea agreement. But the court does not explain how the safety-valve misunderstanding affected rejection of the five-year deal. Instead, the court's analysis of the safety valve focuses only on the decision to plead guilty to the ten-year deal rather than proceed to trial:

> The record makes plain that Hopper was aware that Davis's criminal history placed him in a Category II or higher. [Hopper] was, however operating under the notion that he [Davis] could still qualify for the safety-valve exception because his criminal history was overstated. The law of this circuit has long been that the criminal history point calculation is separate and distinct from the decision that a particular defendant's criminal history is overstated. Simply put, it has been the law of this circuit for nearly two decades that while a court is free to find that the criminal history is overstated—it is not empowered to reduce the point total for purposes of the safety-valve calculation. Thus, Hopper was entirely mistaken when he told Davis that he could still qualify for the safety-valve because his criminal history was overstated. *Based on this misrepresentation of the law, Davis reasonably believed that by pleading guilty he would not be subject to the ten year mandatory minimum.* It is plain from the change of plea hearing that as late as the morning of April 3, 2013, Davis believed that he would be eligible for the safety-valve.

(emphasis added) (citations omitted).

Davis similarly focused on the 10-year deal in arguing the safety-valve issue in his 2255 motion:

Davis will testify at the hearing on his Motion that attorney Hopper advised him on the morning of the second day of his trial (while in attorney Hopper's office) that Davis needed to plead guilty because he was going to lose, that his "name was on the wall", but that Davis would likely qualify for the safety valve provision under the Federal Sentencing Guidelines, and thus not be subjected to the mandatory minimum sentence of ten years.

. . . .

Davis will also testify that, had he known he was going to get at least the minimum mandatory even if he pled guilty, he would have taken his chances with a trial rather than pleading.

In briefing before this court, Davis now asserts he rejected the five-year offer because he believed he was safety-valve eligible:

For all Davis knew, he was safety valve eligible regardless of whether he went to trial, accepted the 5-year plea agreement, or pleaded to the Indictment just as he did. Simple deductive reasoning results in the inescapable conclusion that if Hopper didn't understand the safety valve eligibility requirements when he advised Davis to just "answer the questions and stick with the plea" on April 3, 2013, Hopper clearly didn't know any different during the earlier time frame of him representing Davis. Hopper's incorrect advice clearly permeated Davis's decisions on the plea offers.

But there is no evidence Hopper and Davis discussed safety-valve relief when the five-year deal was offered. The safety-valve exception is thus not relevant to his rejection of the five-year offer. Additionally, Davis testified he rejected the five-year deal because he believed he was innocent, not because he believed he was safety-valve eligible. Thus, he cannot show that but for the misleading advice, he would have accepted to the five-year deal. *See **Lafler v. Cooper***, 566 U.S. 156, 163 (2012) ("To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

-14-

would have been different.'"), *quoting **Strickland***, 466 U.S. at 694; ***United States v. Norvell***, 729 F.3d 788, 795 (8th Cir. 2013), *as corrected* (Sept. 4, 2013) (holding that "[t]o show prejudice, the defendant must establish that he would have accepted the plea but for counsel's advice" and defendant cannot show a legal misunderstanding prejudiced him where counsel still advised him to accept the plea) (internal quotation marks omitted).

At most, Hopper was deficient on the morning of the plea colloquy, when the five-year deal was no longer available and he encouraged Davis to accept the ten-year deal. The proper remedy was not to reoffer the five-year deal. The district court erred in directing the government to do so.

Finally, it is not clear whether Davis was prejudiced by the safety-valve advice. The district court examined whether, but for counsel's erroneous safety-valve advice, he would have accepted the five-year offer. But as discussed, the proper inquiry was whether he would have rejected the ten-year offer and proceeded to trial had he properly been advised by attorney Hopper—as he was advised by the district court—that he was ineligible for safety valve relief from any applicable mandatory minimum sentence. The district court did not make a finding on this issue.

This court remands to the district court to determine whether Davis was prejudiced by the safety-valve advice. If prejudiced, the court should allow Davis to withdraw his guilty plea and proceed to trial. If not prejudiced, the court should dismiss the motion.

\* \* \* \* \* \* \*

The judgment is vacated, and the case remanded.

_____

-15-